UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>THOMAS ANDREW CASSELMAN,<br><br>Defendant. | Case No. 24-cr-111 (DLF) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Thomas Andrew Casselman to 40 months of incarceration (near the middle of the guidelines range), 3 years of supervised release, $2,000 in restitution, and a $100 mandatory special assessment.

**I.     INTRODUCTION**

The defendant, Thomas Casselman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Casselman, a 31-year-old resident of South Carolina and unemployed mechanic, travelled to Washington, D.C. from his home by train on January 5, 2021. There, he joined the storming of the police line on the West Plaza and deployed an oleoresin capsicum ("OC")-based spray at close range at a group of Metropolitan Police Department officers defending the Capitol. He returned to South Carolina again by train on January 10. In the days and months that followed, Casselman made a series of Google search queries reflecting his consciousness of his guilt, including "assault with a deadly weapon on a police officer," and "statute of limitations for assaulting a police officer."

The government recommends that the Court sentence Casselman to 40 months of incarceration for his conviction of violating 18 U.S.C. § 111(a). A 40-month sentence reflects the gravity of Casselman conduct, but also acknowledges his early acceptance of responsibility and admission of guilt.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, Doc. 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.     Casselman's Role in the January 6, 2021 Attack on the Capitol**

On January 5, 2021, Casselman travelled to Washington, D.C. from his home by train. His train arrived in the morning of January 6, and he quickly joined the crowds of individuals who had congregated for former President Trump's "Stop the Steal" rally. He wore jeans, a black jacket, a black Carhart brand hat, an American flag gaiter around his neck, and a "We the People" gaiter pulled up over his face. *See Image 1.* He also carried a backpack.



*Image 1: Still open source image of Casselman (circled in yellow) approaching the Capitol on foot on January 6*

Casselman eventually joined the rioters crowding the West Plaza of the Capitol. There, Casselman positioned himself near the media tower in front of an established police line maintained by Metropolitan Police Department (MPD) officers who were working to maintain an arc-formation around the West Plaza to prevent rioters' entry into the terracing of the Building and the Building itself. MPD officers were present at the Capitol to reinforce and assist U.S. Capitol Police, who were overwhelmed by the large numbers of rioters present on Capitol Grounds. There, Casselman taunted officers with a copy of the U.S. Constitution, and implored officers that they were "fighting the wrong fight" and "should be facing that way" (in other words, that the officers should be facing the Capitol, like the rioters were, rather than defending the Capitol, with their backd towards it). *See Image 2.*



*Image 2: Still image from 00:09 of Video Exhibit 1, showing Casselman (boxed in yellow) approaching officers with a copy of the Constitution (circled in yellow)*

4

Minutes later, the police line began to fall as officers were overwhelmed by the size and the violence of the crowd. As other rioters fought with officers, Casselman stepped forward and deployed a cannister of oleoresin capsicum ("OC")-based spray in close range of several officers. The OC-based spray directly hit MPD Lieutenant L.H. and MPD Officers B.S., P.N., and B.R. near their faces, leaving bright orange residue visible on their clothing and protective equipment. *See Images 3 and 4.*



*Image 3: Still shot from Video Exhibit 3, L.H.'s body worn camera at 14:28:48 showing Casselman (circled in yellow) deploying OC-based spray*



*Image 4: Still shot from Video Exhibit 2 at 1:00 showing Casselman's outstretched hand (circled in yellow) deploying OC-based spray at officers*



*Image 5: Still shot from Video Exhibit 2 showing the four officers reacting to being hit with Casselman's OC-based spray*

Immediately after Casselman deployed the OC-based spray at officers, Video Exhibit 2

6

shows the officers staggering backwards and struggling to remain upright. Video Exhibit 3 (from one of the officer's body worn cameras) also demonstrates that although the officers were partially protected from the spray by their helmets' face guards, those face guards became very difficult to see through because of the residue of the orange spray. As a result, the officers' vision was significantly impaired, hindering their ability to protect themselves and do their job in defending the Capitol.

Shortly after this assault, Casselman receded back into the crowd. Geolocation evidence from Casselman's cell phone shows that in total, he remained on the West Plaza of the Capitol Building from approximately 1:15 p.m. until 3:42 p.m. Amtrak records show, however, that he did not depart from the Washington, D.C. until two days later, on January 10, 2021.

### *Casselman's Internet Search History*

In the days and months that followed January 6, Casselman made a series of Google search queries reflecting his consciousness of his guilt, including:

- "charges for dc rioters" (inquiry made on January 16, 2021)
- "Capitol arrests lists" (January 16, 2021)
- "how many times has capitol hill been breached" (January 16, 2021)
- "the statute of limitations for assault on a federal officer" (January 18, 2021)
- "assaulting a federal officer punishment" (January 18, 2021)
- "The Federalist Papers about overthrowing the government" (May 25, 2021)
- "what is the definition of domestic terrorist" (May 28, 2021)
- "fbi wanted list" (August 25, 2021)
- "fbi wanted list jan 6" (August 25, 2021)
- "assault on a police officer" (August 25, 2021)
- "assault with a deadly weapon on a police officer" (August 25, 2021)
- "statute of limitations on assaulting a police officer" August 26, 2021)
- "what does the fbi need to have a warrant" (September 1, 2021)
- "how long does Verizon keep text messages" (September 14, 2021)

Casselman also made other concerning queries after January 6 that reflected an interest in conspiracy theories, terrorist groups, and potential bomb-making:

- "1312" (May 23, 2021)
    - Note: This is a known code for "acab," or "all cops are bad."
- "acab" (May 23, 2021)
    - Note: This is a known abbreviation for "all cops are bad."
- "where we go one we go all" (May 24, 2021)
    - Visited "'Where We Go One, We Go All': The Philosophy of QAnon – The Forum"
- "hamas" (May 28, 2021)
- "cast iron pressure cooker" (May 30, 2021)
- "paramilitary" (May 31, 2021)
- Defined: "manifesto" (June 1, 2021)

Casselman also had several other queries relevant to his intent on January 6 that pre-dated January 6:

- "when did white become the minority in united states of America" (November 25, 2020)
- "how to make Tannerite more sensitive" (November 26, 2020)
    - Note: Wikipedia defines Tannerite as "a band of binary explosive targets used for firearms practice and sold in kit form."
- "how to make tannerite" (November 26, 2020)
- "tannerite" (November 26, 2020)
- "thermite" (November 29, 2020)
- "1776ers" (December 4, 2020)
- "Boogaloo Revelations" (December 12, 2020)
    - Note: The Boogaloo movement is a "significant domestic violent extremist threat" that is "best conceptualized as a decentralized, anti-authority movement composed of a diverse range of actors mobilized in part by adherents' belief that they are following in the footsteps of the United States' founders and participating in a revolution against tyranny."[2]

---

[2] "The Evolution of the Boogaloo Movement," Matthew Kriner & Jon Lewis, Combatting Terrorism Center at West Point, CTS Sentinel, Vol. 14, Issue 2, Feb. 2021, available at: https://ctc.westpoint.edu/the-evolution-of-the-boogaloo-movement/ (last visited June 18, 2024).

- "who tries treason cases" (December 13, 2020)
- "attorney lin wood" (December 14, 2020)
- "3% symbol" (December 17, 2020)
    - Note: The Three Percenters define themselves as follows: "During the American Revolution, the active forces in the field against the King's tyranny never amounted to more than 3% of the colonists. Three Percenters today identify with this 3% because they were true patriots fighting for the freedoms the nation we love and honor was founded on."[3]
- "calm before the storm trump" (December 18, 2020)
- "calm before the storm meaning" (December 18, 2020)
- "What gas does dot 3 and chlorine make" (December 18, 2020)
    - Visited "Yes, Mix Pool Chlorine and Brake Fluid For a Plume of Fire…"
- "how long does dot 3 and chlorine take to ignite" (December 18, 2020)

### *December 2021 Interview*

On December 28, 2021, FBI attempted to interview Casselman in a public location. After being advised of his rights and that it is a federal crime to lie to or mislead federal agents, Casselman agreed to speak with FBI agents. He admitted to being in Washington, D.C. on January 6, 2021 and informed agents that he had deleted his photographs and social media accounts after that day. Without prompting, he stated "I don't know if that falls under destruction of evidence." Casselman also provided an email address to agents and indicated that it was the same email address he had used on January 6. Upon further investigation, however, agents learned that the account provided was only created on December 18, 2021, well after the events of January 6, 2021.

Casselman also spoke to agents about struggling with his mental health and alcoholism. He told agents that he thought that his mental health issues made him vulnerable to manipulation

---

[3] "The Three Percenters: Who We Are," The Three Percenters, Archived from the original on August 14, 2013, Retrieved February 1, 2021, available at: https://web.archive.org/web/20130814202144/http://www.thethreepercenters.org/ (last visited June 18, 2024).

9

online, and that he had been "brainwashed" online by persons utilizing social media to target people like him. In hindsight, he called some online conspiracists "space cadets" and expressed that he did not like that some online groups seemed to be proud of hurting people.

Casselman also vaguely described to agents that he had tried to make amends or atone for some unspecified conduct on January 6. Later in the interview, agents showed Casselman a picture of the FBI BOLO photographs for him, at which point he responded that he didn't know if he should answer any further questions without his lawyer. Agents' questioning of his January 6 conduct was then terminated.

## III. THE CHARGES AND PLEA AGREEMENT

On March 24, 2023, Casselman was charged by Complaint with eight counts, including, assaulting a federal officer with a deadly weapon, in violation of 18 U.S.C. § 111(a) and (b). On March 21, Casselman was convicted of the lesser included offense of assaulting a federal officer in violation of 18 U.S.C. § 111(a) based on his guilty plea to the Information, pursuant to a written plea agreement.

## IV. STATUTORY PENALTIES

Casselman now faces sentencing for assault on a federal officer. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

## V. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the Guidelines calculation contained in the PSR and as calculated in the plea agreement.

Count One: 18 U.S.C. § 111(a)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | +6 |
| | **Total** | **24** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **21** |

*See* Plea Agreement, Doc. 25 at 3.

The parties agreed in the plea agreement that the "Zero Point Offender" adjustment under Section 4C1.1 does not apply in this case, in light of Casselman's use of violence against Metropolitan Police Department officers on January 6, 2021 and his possession of a dangerous weapon as broadly defined in 1B1.1 cmt. n.1. In addition, the Probation Officer has identified that Casselman has one criminal history point for Possession of 28 grams or less of Marijuana in 2013, meaning that he has been assessed one criminal history point is therefore ineligible for that reason as well.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 88. Accordingly, based on the defendant's total adjusted offense level, after

acceptance of responsibility, at 21, Casselman's Guidelines imprisonment range is 37 to 46 months of imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein and within the PSR.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Casselman's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Casselman himself assaulted at least four identified officers with OC-based spray, handicapping their vision and ability to defend themselves and the Capitol from the onslaught of assaults by rioters. The nature and circumstances of Casselman's offense was of the utmost seriousness, and fully support the government's recommended sentence of 40 months.

### B. The History and Characteristics of the Defendant

The defendant is an unemployed auto mechanic. He earned his G.E.D. at age 16 after he was expelled from his public high school for behavioral reasons. PSR ¶ 67. He is the child of two U.S. servicemembers, but he has never served in the military himself. *Id.* ¶¶ 49, 51, 69. He has limited criminal history, but was assessed one criminal history point for a marijuana possession charge in 2013. *Id.* ¶ 42.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Casselman's criminal conduct on January 6 was the epitome of disrespect for the law and disregard for human suffering.

### D. The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs substantially in favor of a lengthy term of incarceration. First, the Casselman's conduct on January 6 showed an extraordinary disregard for the pain and suffering of the sworn police officers in front of him. Unlike some January 6 defendants who were only following the crowd, or even those who pushed against officers in a throng of other rioters, Casselman deliberately and intentionally stepped forward out of the crowd for the purpose of assaulting police officers with the OC-based spray he had brought with him. And he did so at extremely close-range, such that the stream of OC-spray visibly hit at least four officers near their faces. Testimony in other January

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

13

6 trials has illustrated that this kind of close-range hit can result in severe and permanent injury. *See, e.g.*, Sergeant Bogner Testimony, *United States v. Schwartz*, 21-cr-178, 12/1/23 Trial Tr. at 725, 787.

More, Casselman's online search history following January 6 depicts a man with significant consciousness of guilty, and yet he took actions to evade responsibility by deleting his social media accounts (which, by his own admission could be seen as destruction of evidence) and providing an email account to agents that he knew was not the account that they had asked for. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Casselman's online search history in November and December of 2020 before January 6 and his queries in the months following January 6 show a deeply concerning interest in organizations committed to varying degrees of violent extremism. His search history reveals that Casselman sees himself and the events of January 6 as a part of a revolutionary movement, rather than what it was – as an attack on democracy.

On the other hand, the Government readily acknowledges that *some* of Casselman's statements from his December 2021 interview are to his credit. By then, he did express some vague notions of remorse, in that he had begun volunteering in his community to "atone" for his behavior. Though he did not admit or express specific remorse for spraying police officers with the OC-

14

based spray at the time, his statements show that he had gained some perspective in the months since January 6 and recognized the negative impact of social media on his life.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This case bears significant similarities to others in which defendants were convicted by guilty plea of assaulting police officers during the riot at the Capitol on January 6, 2021. In those other cases, this Court and others have imposed lengthy sentences of incarceration. For instance, in *United States v. James Mault*, 21-cr-657 (BAH) the defendant also pled guilty to one count of violating 18 U.S.C. § 111(a) for assaulting police officers on January 6 after being charged with the aggravated offense of assaulting police officers with a deadly or dangerous weapon in violation of 18 U.S.C. § 111(b). His offense level, criminal history category, and recommended guidelines range were the same as Casselman's are here. *See* 21-cr-657, Gov't Sent. Memo, Doc. 61. Like Casselman, Mault also assaulted officers with chemical irritants on the west side of the Capitol. *See id.* at 2. The Government in Mault's case recommended a high-end guidelines sentence of 44 months, which the Court imposed.

*United States v. Barry Ramey*, 22-cr-184 (DLF) is also worth considering. As the Court will likely recall, Ramey was convicted at a bench trial of two counts of violating 18 U.S.C. § 111 (assaulting certain officers), one count of violating 18 U.S.C. § 231 (civil disorder), and four

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

associated misdemeanor counts for his conduct on January 6, 2021. Ramey's case is distinguishable, to be sure: he did not receive acceptance of responsibility credit; he was convicted on multiple counts, resulting in an increased offense level for multiple groups; he was assessed additional offense levels for causing bodily injury; and he spent hours on January 6 marching with the Proud Boys. Nevertheless, the core of Ramey's case is very similar to Casselman's; both men assaulted multiple police officers (Ramey, two officers on two occasions; Casselman, four officers during one occasion) with OC-based spray at close range where the victims took direct hits of the spray towards their faces. In *Ramey*, this Court imposed a sentence of 60 months on the assault and civil disorder charges. Casselman is before the Court facing a much more favorable guidelines range, but his conduct nonetheless warrants a substantial status like the sentence imposed in *Ramey*.

## VII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Casselman must pay $2,000 in restitution, which reflects in part the role Casselman played in the riot on January 6.[8] Plea Agreement at 8-9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Casselman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 107.

## VIII. FINE

The defendant's convictions for violating 18 U.S.C. § 111(a) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

19

set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. Moreover, Casselman is represented by appointed counsel, and a defendant's representation by appointed counsel is "a significant indicator" of inability to pay a fine. U.S.S.G. § 5E1.2, comment. (n.3).

## IX. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 40 months of incarceration (near the middle of the guidelines range), 3 years of supervised release, $2,000 in restitution, and a $100 mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   /s/ Katherine E. Boyles
Katherine Boyles
Assistant United States Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Katherine.Boyles@usdoj.gov
Phone: 203-931-5088