IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 24-CR-111-1(DLF) |
| ) | |
| vs. ) | |
| ) | DEFENDANT'S SENTENCING |
| THOMAS ANDREW CASSELMAN, ) | MEMORANDUM |
| ) | |
| Defendant. ) | |

Thomas Andrew Casselman, by and through his undersigned counsel, respectfully submits this Sentencing Memorandum to assist the Court in fashioning a reasonable sentence. The advisory guideline range suggested in the Presentence Investigation Report ("PSR") and advocated by the government is greater than necessary to accomplish the goals of sentencing in 18 U.S.C. § 3553(a), and it is inconsistent with United States v. Booker, 543 U.S. 220 (2005), United States v. Rita, 551 U.S. 338 (2007), and Gall v. United States, 552 U.S. 38 (2007). At sentencing slated for July 18, 2024, Tommy will seek a downward variance from the advisory Guidelines range and an out of Guideline sentence.

I.   **Background**

"My President needs us to do this."

Tommy did not come to Washington DC armed with anything other than what he described as "a piece of paper." When pressed initially, he revealed the piece of paper to be a copy of the United States Constitution. He seemed embarrassed and sheepish that he carried it. Counsel tried to ascertain why he went to DC that day, why he took a copy of the constitution and if he believed in the Constitution or believed that his actions

were justified in defense of it. It was not until the first day of July 2024, some three and half years after January 6, 2021 and after countless conversations with Tommy that the truth of his belief that day finally came out. Tommy came to DC because he believed that the Constitution was being subverted. He believed it because the man who was entrusted with the highest office in the land and the final defense of the Constitution, the President, told him so.

    The reason counsel did not learn of Tommy's motivation prior to July 1, 2024 was because Tommy is an intensely private person who is loathe to reveal his thoughts. He is a complex person and keeps his own counsel. When prompted, repeatedly, for justifications or even potential mitigating information, Tommy stonewalled and deflected, politely and resolutely. Finally, just weeks before sentencing, he consented to counsel's repeated entreaties to let her speak with his family. Tommy's reasoning that they not be involved centers on his protectiveness and deep devotion to his family. Tommy knew instantly that his action that day was wrong. The guilt has consumed him, and he has spent the last three and a half years in a cycle of shielding his family, isolating himself, awaiting punishment and punishing himself.

    To say that Tommy is a devoted son and brother is an understatement. He communicates with his three sisters every day. As his middle sister, M[1]., noted, they all have a location monitoring app installed on their phones and consequently know where each is at all times. She notes that Tommy "doesn't like for it to be on" but that he acquiesces for them. His devotion to his sisters began at an early age, particularly for the younger two sisters. M. relayed early memories of walking home from school on

---

[1] Counsel is using initials to refer to Tommy's family members.

days that her parents were unable to pick her up and recalled that she never walked home alone. She said that whether he was present at school that day or not, he was always there to walk her home. Even though the distance was not great, he did not want her walking home alone. During their childhood, their mother and stepfather both worked outside the home and M. describes summertime as a time when Tommy and their older sister would watch the two younger sisters during the day. She recounts one such summer day when she was about thirteen, Tommy caught her watching a soap opera and became terribly upset and adamant that she was too young to watch such things.

All three of his sisters and his mother and stepfather refer to Tommy as "a protector."  One sister asserted that Tommy learned to be protective and caring from his stepfather, the only father figure he has ever had. She told a story of Tommy's stepfather opening a mechanic shop as a business but noted he had to close it after only one year. The reason? He gave away service too much out of kindness. Tommy certainly took that attitude to heart and has displayed it all his life. His character for kindness extends past his family to friends, acquaintances, and strangers. His sisters each note his propensity for helping people who may be struggling. One noted that if he sees someone in a parking lot with the hood of their car up, Tommy will stop to assist. His youngest sister, R., said "did you hear about him helping out in Mississippi after Hurricane Ida"? According to R, he "loaded up his car with supplies and spent 2 weeks helping out in Mississippi." When asked if he went as part of a group, she stated that she believed it was him and a group of his friends and that they coordinated with

Church groups and humanitarian organizations, but that he went on his own to help. As R. aptly put it, "he helps anyone."

His oldest sister, S., while noting that Tommy has "always been a protector" she turns to him for comfort in times when she has struggled. As the oldest of the 4, S. described their upbringing as financially, a struggle. When they were young and their mom was deployed or at a particularly strenuous duty station, she describes them being shuffled from one relative to the next. Once their mom married his stepfather and both worked full time outside the home, she and Tommy were responsible for the younger two sisters. Both younger sisters mentioned his devotion and care during this time. Youngest sister, R. said that in her twenty-three years of life she can "count on one hand the number of times he got upset" with his family and she can not remember him raising his voice to her. As she put it, "he can't get angry at those he cares about."

Tommy's mom recalls his upbringing as challenging due to his ADHD and learning disability. She described his struggle with schoolwork and his frustration at his inability to spell or write well. But she noted that Tommy has always been a reader. She said that when his youngest sister R., recently moved out she took a photo of Tommy reading National Geographic magazines to her when she was little. His mom reports that R. brought it back because she knew it was her mother's favorite photo. His love of reading blossomed into a love of research, science, and philosophy. His mom points to him learning to grow tomatoes hydroponically, even though he does not eat tomatoes. He told her "if I can grow them, I can grow anything." He has an intense desire to learn coupled with a keen sense of embarrassment when he makes a mistake, according to his family.

## II. Aftermath and remorse

Tommy's devotion to family and willingness to assist and help others are lifelong traits and characteristics. These traits also help explain Tommy's actions following January 6, 2021. In order to see the whole picture of Tommy's progression of guilt, remorse and acceptance of responsibility, we need to get a picture of his life prior to going to Washington, DC. As the letter from his prior landlord, Mr. Slaton notes, Tommy rented a cabin from him for several years. The cabin was located on the shores of Lake Hartwell, South Carolina. Lake Hartwell is an area in the upstate of South Carolina that has experienced a housing boom and has become an attractive lake community. Tommy's cabin was part of a cluster of RV's, trailers, and cabins on the shore that had transitioned from a seasonal campground setting to a more permanent residential area. While million-dollar homes were emerging on the other sides of the shoreline, this area was populated by mostly elderly residents who made their transitional or winter camp residents their year-round abode. Tommy and his sisters described it as a retirement community.

As his landlord noted, Tommy often performed mechanical work for the elderly residents, mostly free or for little charge. Tommy also befriended many of the community despite the decades in age difference between them and himself. Tommy talks some about the elderly ladies he assisted, but his closest friendships were with a handful of older men. Near the community was a mom-and-pop style convenience store and Tommy would meet a group of his elders in the mornings before work and in the evenings and weekends for breakfast. Over coffee, they would converse about politics, the economy and life in general.

One of these gentlemen, Frank Boyd, spoke with defense counsel on the 4th of July. Frank is a retired FBI agent. Now in his 80's, he spent his entire career in law enforcement and from 1972-1999 he was an FBI agent, mostly working in fugitive apprehension. He also served as the principal firearm instructor for the Atlanta division until his retirement. Frank described the makeup of the ad hoc coffee group as "a bunch of old retired guys" and that several of the others, in addition to himself, were retired law enforcement. He stated that he has known Tommy for over twelve years and found him to be "gregarious and respectful." He described him as "his own man" who will "stand for what he believes but will listen and be open to change if he is proven wrong." He expressed admiration for Tommy's intellect and talent with mechanics. He also noted that he only saw "what was on Fox News" regarding January 6, 2021 and did not know exactly what Tommy had been charged with but was surprised that he got "caught up in it". He was aware that Tommy had been charged and plead guilty but not the details of the situation because Tommy only talked about how he would take his punishment. Frank said, "he's accepted responsibility for it" and made "no excuses." Frank also noted that that was "who Tommy is" saying "he always takes the blame for his actions without excuse, even if he gets a flat tire, he will say it is his fault for trying to drive on that tire too long and not buying a new one."

His landlord, Perry Slaton, echoed this in his letter (attached hereto) in that Tommy showed "genuine regret" and "never once tried to defend, minimize, or explain away is activities." Both he and "FBI Frank," as Tommy calls him, note that Tommy's actions were out of character. Both ask the court to take this into consideration and remain firmly supportive of Tommy in the future. Frank even said that in all his years of

law enforcement and retirement that he had never offered to "sponsor" someone, but he wanted the court to know that if he could, he would for this "fine young man."

When the FBI showed up to interview Tommy in December, 2021, he knew that he would likely be charged for his action the prior January. When the FBI showed up at his older sister's employment (S. and M. both work for a state agency in South Carolina) asking his pregnant sister about her brother, he started to make changes in his life. That interview marks the date between the "old Tommy" and the "Tommy" who appears before this Court. He began isolating and insulating his friends and family from his actions and anticipated punishment. As stated previously, he began punishing himself.

He moved away from the retirement community and the convenience store coffee gaggle of friends. He returned home to his mom and stepfather's residence. He broke up with his longtime girlfriend. He gave away his bees.

In all the discussions with defense counsel, the subject of beekeeping had come up. Tommy was animated and knowledgeable about bees, beekeeping, and the use of honey in food and medicine. Beekeepers, by nature, are calm and gentle to not alarm the bees and cause danger to the bees or themselves. Described by his sister, M. as a "gentle soul," Tommy is a beekeeper. When counsel asked M. to tell me about his beekeeping she immediately exclaimed "Oh, my gosh, the bees." According to her, one "random summer" years ago Tommy began keeping bees for honey. She said that Tommy "loves bees" and was devoted to their care and cultivating the honey. It was surprising to counsel when she followed this up with "when all this happened, he gave them all away to his friend." After the FBI visit and his move home, Tommy gave all his bees and hives to his friend. M. said that she believed he did it because he believed he

would be punished in the future and did not want the bees to suffer nor be a burden on his family. Tommy did not tell defense counsel he had given his bees away and this did not happen recently, he gave the bees away over a year before his arrest in this case.

His mom describes other actions he has taken to insulate his family. She said that he has been steadfast in not wanting them to be involved in his case or suffer due to his action on January 6, 2021. She described not only the giving away of his beloved bees, but also his isolation from family and friends. She talked about him and his youngest sister R., digging a pond by hand in the back yard. Prior to these events they had dug it larger, and he had procured a new pump for it with the plan of stocking it with fish. It sits unfinished and unstocked, with the pump next to it because Tommy told her he did not want to "leave them with that responsibility." She described how Tommy and R. rented a house at the beach for a week in July every year for the last four years. The other two sisters and their extended families each rent adjacent homes for the same week for a large group of 20 young adults. She described how Tommy is always protective of the younger teen stepchildren of his older sister during that week. This year he refused to go due to his recent conviction. As she said, he "didn't want his actions to reflect on anyone else." She described his worry about her and his stepfather answering the phone when his case became public in an attempt to shield them from some ugly calls he received at work and at home. He did not grow any of his usual hydroponic tomatoes this year. As she said, he has "put his entire life on hold waiting for his punishment."

This is never more apparent than when talking to his oldest sister, S.about his life in the last couple of years. S. gave birth to her first child in 2022. She was pregnant with

that baby when the FBI came to her workplace. Tommy did not attend his nephew's first birthday party and was absent again from his recent second birthday celebration. S. sees this as him continuing to insulate the family from his actions. Through tears (to be fair, S. is currently pregnant with her second child), S. stated that she knows he would have a vastly different relationship to his nephew if he wasn't punishing himself and protecting them. She vividly recalls how he looked when he returned to South Carolina after January 6, 2021. She said she had "never seen him look so betrayed…so defeated."

### III.   Sentencing Guidelines

This Court does not require another recitation of *Booker*, the parsimony clause, or a dry recitation of the §3553(a) factors, This Court is well-versed in all. Rather, the undersigned counsel will set out why, as to Tommy Casselman, the sentencing guidelines are largely inapplicable and as reached, too high to be of use to this Court in fashioning the appropriate sentence.

In this case, like many of the January 6, 2021 cases, the guidelines reveal glaring weaknesses. The statute itself encompasses a large variety of conduct from simple assault to assault with a dangerous weapon. Initially charged with the more serious §18 U.S.C. 111(b), Tommy plead guilty to the lesser included §18 U.S.C. 111(a). The single separating factor between simple assault and 111(a) is the element of physical conduct. In this case the physical conduct element is met by the contact of the spray with the officers' helmets and face shields. But in other cases, the physical element is met by actual hand-to-hand combat or forceful pushing. The statute also encompasses different

victims in differing capacities and situations, thus magnifying the variables and making comparisons even more specious and subjective.

While the Guidelines promulgated by The United States Sentencing Commission attempt to make objective measures based upon the many variables, the guidelines themselves remain subjective. When the government puts forth examples of comparison cases based upon the Guideline calculations, some of those variables are already articulated. For example, the government notes that the Guidelines in *United States v. Barry Ramey*, 22-cr-184 (DLF) were higher due to lack of acceptance of responsibility and additional charges. Thus, that case is already distinguishable before comparing the defendant's actual conduct. Pointing to another OC spray case with similar guidelines *United States v. James Mault*, 21-cr-657 (BAH), that defendant and Tommy both employed chemical spray on January 6, 2021, but the similarities end there. Mr. Mault had a co-defendant; he had breached several lines of officers and was part of the push in the "tunnel" on the West terrace of the Capital. He was a former Army officer who brought chemical spray and body armor with him to the Capitol. He and his co-defendant planned and prepared for violence days prior to arriving in DC. In addition to spraying the officers in the tunnel, they moved barricades and assisted other rioters to get further into the Capitol complex. But Mr. Mault (and his co-defendant) had the same guideline calculations as Tommy. Thus, the comparison is purely subjective.

This court must consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. §18 USC 3553(a)(6). That proviso does not translate into "the court must sentence all defendants the same" simply because they share a statute of conviction, a date of

offense, and chemical spray. The differences between Tommy's actions that day and others warrant a lesser sentence than the Guidelines and to do so would not be an unwarranted disparity, but a disparity supported by the remaining factors of §18 USC 3553(a). Counsel would submit *United States v. Matthew Council*, 21-cr-207 (TNM) as an example of a warranted sentencing disparity in a similar case. Convicted of the same statute as Tommy (in addition to other statutes), with the government recommending a Guideline sentence of 30 months, Judge McFadden sentenced Mr. Council to five years' probation with stringent conditions. Mr. Council had significant mental health issues that contributed to his presence and actions in the Capitol that day and that contributed to Judge McFadden's sentence, but the disparity was warranted in that case.

Counsel asserts that Tommy's sentence should be below and outside the guidelines because it is warranted by his action and notably what he did not do. Tommy did not travel to the Capital that day expecting or planning for violent insurrection. He came alone carrying a copy of the Constitution. He never breached a single barricade or barrier, the sole instance of his criminality occurred at the outermost barrier. He did not bring or procure the chemical spray; it was pressed into his hand during the riot. He did not maintain a social media presence before or after the January 6th riot and did not contribute or amplify the cacophony of online support for the violence. He did not make any statements that day glorifying violence or urging the crowd. When pressed by the crowd close to the officers, he can be seen clutching his copy of the Constitution, not grabbing the officer's shield, or pushing. He deployed the spray from a distance and is

thankful he did not injure any of the officers. Then he left. He did not breach the barricades; he did not enter the Capitol or join other rioters.

He went home and readily admits that his computer searches are evidence of his guilt. He has never denied or minimized his conduct. He believes he should be punished. He has expressed remorse and will express remorse in Court at his sentencing hearing. He is ashamed and sorry and blames no one for his actions beside himself.

**IV.    Proposed Sentence**

Tommy Casselman plead guilty to a felony and agrees that he should be punished for his actions on January 6, 2021.

A sentence of probation with a component of home detention would be the appropriate sentence in this matter. Tommy can and will abide by the strictures of home detention and will continue to reside in the family home. Such a sentence would satisfy the parsimony clause and serve as a deterrent for future criminal conduct from Tommy, as well as a general deterrent to the public at large. It would encompass the serious nature of the offense while recognizing that it was an anomaly for Tommy that has resulted in a lifetime of being a convicted felon. Such a sentence with a component of home detention would allow Tommy to continue to work thus enabling him to pay the restitution in this matter as well as supervision fees and still provide the oversight and possibility of incarceration for any, unlikely, violation.

Respectfully Submitted,

/s/Renae Alt-Summers
Renae Alt-Summers
DC Bar ID #: SC0011
3608-C Landmark Drive
Columbia, SC 29204
(828) 243-5253
raltsummers@gmail.com

Columbia, South Carolina
July  5, 2024